IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LUIS LORENZO MOJICA,<br><br>    Plaintiff,<br><br>    v.<br><br>ADVANCE AUTO PARTS, INC.,<br><br>    Defendant. | CIVIL ACTION<br>NO. 15-1418 |

### MEMORANDUM

**SCHMEHL, J. /s/ JLS**                                                    January 11, 2016

In this employment discrimination case, Plaintiff has not put forward enough evidence, with enough detail, for a fact finder to conclude he has made out his claims. Plaintiff relies in part on his own subjective inference that his supervisor had discriminatory motives, which does not constitute evidence. He does offer objective evidence concerning a few incidents of white employees receiving favorable treatment, but he lacks the information necessary to make a valid comparison with these other employees. Accordingly, the Court will grant summary judgment in favor of Defendant.

Factual and Procedural Background

Plaintiff Luis Lorenzo Mojica is a Hispanic man from the Dominican Republic. Defendant Advance (named in pleadings as Advance Auto Parts, Inc., and, according to Defendant, correctly named Advance Stores Company, Inc.) is an automobile parts and accessories seller with thousands of retail locations and forty-five distribution centers.

Plaintiff worked as a General Warehouse Worker, specifically an order picker, at a distribution center in Kutztown, Pennsylvania, for exactly one year from May 9, 2011, until May 9, 2012. The warehouse was broken up into multiple numbered zones considered light, medium, or heavy depending on the different sorts of products in each zone. Pickers received work assignments through an electronic, headphone-based system that gave them their next work order and also allowed them to check through the various zones to see where work needed to be done. In many areas, pickers made use of power equipment to help them access and transport products. One or more zones, however, featured conveyor belts for transporting products, making the power equipment unnecessary.

In doing their work, Plaintiff and his fellow employees had productivity percentage requirements. In their statements of fact relating to the present motion, the parties agreed that "gap time" refers to periods during which an employee is on the clock but not working, which necessarily reduces his or her productivity. They further agreed that "indirect time" is gap time that occurs for reasons out of the employee's control, for instance when a battery is being replaced. (Plaintiff, in his deposition, appears to use "gap time" to mean "indirect time" or to refer to the entire framework, and he suggests another primary purpose was to give employees a break on their productivity when they were getting up to speed on work that was new to them.) Supervisors reviewed and approved employee requests for indirect time so that these periods did not count against the employees' productivity scores.

Plaintiff's direct supervisors were Todd Broniak and William Lehman (though not noted in the statements of fact, Plaintiff's deposition and the affidavit of Jeff Campbell

2

both also list Annie Sufrinko as being in this position); they in turn reported to Jeff Campbell, Third Shift Production Manager. Fernando Plaud was Human Resources Manager for the facility.

There are essentially four factual situations that arose during Plaintiff's employment that relate to his claims. First, Plaintiff testified that on one occasion Campbell did not let him use gap time (presumably indirect time). Plaintiff had one week for which his productivity percentage was low, and he requested indirect time. He testified that Campbell did not let him use indirect time on that occasion. There is no information on record regarding why Plaintiff thought he should have been entitled to indirect time or why Campbell disagreed, nor is there any information regarding requests and approvals for indirect time by other employees.

Second, Plaintiff claims he was disproportionately assigned to work in heavy zones. He testified that he was sometimes assigned to the undesirable heavy zones three out of five workdays, and might even then be called in to help in the heavy zone on a fourth day. By contrast, he stated, "I see white guys, one with one day in the week, or maybe the most twice a week" (Pl. Dep. at 98). Plaud's affidavit states that Plaintiff was assigned to heavy zones 19% of the time and light zones 81% of the time, though there is no reference to the zone assignments of other employees.

Third, even though power equipment was unnecessary for working in the conveyor belt area, employees liked to drive power equipment there (rather than walk) and then leave it parked near the conveyor belt while they worked in that zone. A few months before his termination, Plaintiff was for the first time assigned to the conveyor belt zone. Having seen others drive the equipment there and leave it parked by the

conveyor, he did the same, but Campbell told him not to. Plaintiff testified that two particular white employees ("the white guys who used to work there, they used to work two white guys over there"), one of whom worked each side of the conveyor, continued to park their motorized equipment by the conveyor. Thinking perhaps it was acceptable after all, Plaintiff did so again and was again told not to by Campbell. Plaintiff testified that he did not know if these other employees were reprimanded. They have not been identified, and the record contains no further information about them.

  Finally, the day before his termination, Plaintiff was finishing his shift and, checking the assignment system, found there were no more jobs available in any zone. According to Plaintiff, he discussed this with Campbell, who checked with Ms. Sufrinko and confirmed there were no jobs listed; Campbell told Plaintiff to log out, clean his aisle, and clock out. Campbell then discovered another job listed in the system and told Plaintiff that he had to do it. Plaintiff was otherwise finished up and testified that other employees—white according to Plaintiff—were already leaving but not yet gone. He believed the remaining job had not previously appeared in the system, may have been dropped by another worker who thought better of starting it, and was too long to complete before the next shift arrived. He also thought it unfair that he was being singled out to complete the job while others were leaving. As a result, he did not do the job and left work.[1]

---

[1] Campbell's affidavit differs from Plaintiff's deposition testimony regarding some aspects of these incidents. For instance, Campbell says he had no role in approving indirect time and that he does not recall reprimanding Plaintiff about parking the power equipment near the conveyor, and his account of the incident leading to Plaintiff's termination does not include conferring with Plaintiff, finding no work available, and telling Plaintiff to clean up and leave before subsequently instructing him to do an additional job. Because this opinion addresses Defendant's motion for summary judgment, the Court analyzes the case on the basis of accepting Plaintiff's version as correct when it conflicts with Defendant's testimonial evidence.

As to Campbell's motivations, Plaintiff simply testified, "I know he was racist of me. When I see the difference, could be because I was Hispanic because he doesn't do nothing with the white guys. And they're white and I'm Hispanic, so how do you want me to see it? Because I was Hispanic. That was the reason, I would think" (Pl. Dep. at 91).

On April 24, 2012, Plaintiff complained about mismanagement and racist discrimination by Campbell via Advance's internal hotline. The complaint was investigated and one correction was made to Plaintiff's zone rotations. The parties dispute whether Campbell ever knew of this complaint prior to this lawsuit.[2]

The incident described above in which Campbell noticed a job in the system after Plaintiff had begun getting ready to leave occurred at the end of the shift that ended the morning of May 9, 2012. After Plaintiff left, Campbell reported to Plaud and recommended discipline and possibly termination. Plaud considered the situation and decided to terminate Plaintiff; when Plaintiff came in to work that evening, Campbell informed him of his termination.

Following the EEOC process, Plaintiff filed this suit on March 19, 2015, bringing claims for discrimination, hostile environment, and wrongful termination related to his national origin under Title VII and the PHRA, as well as a race discrimination claim under 42 U.S.C. § 1981. Defendant subsequently filed a motion for summary judgment, which the Court discusses below.

---

[2] Plaintiff states in his deposition testimony and brief that his termination was because of his complaints about discrimination; however, he makes this statement by way of arguing (counter to Defendant's contention that the refusal to complete an assignment on his last day was the only factor in his termination) that his termination was connected to the previous allegedly discriminatory incidents, not necessarily to the hotline complaint. Regardless, as Defendant notes, Plaintiff has not brought a retaliation claim.

Discussion

      Two issues must be addressed before turning to the main analysis. First, some of the briefing gets diverted by a debate over whether Plaintiff's testimony constitutes evidence. The parties are talking past one another, and the resolution of their supposed disagreement can be simply stated: Plaintiff's testimony regarding objective facts that might imply discrimination is acceptable evidence of those facts for the purpose of opposing this motion, while his testimony about his subjective conclusions as to other people's motivations or other matters is not valid evidence on those issues. *See Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798-99 (3d Cir. 2003) (although language in *Sarullo* could suggest that a plaintiff's testimony to the objective fact that coworkers and supervisors called him discriminatory nicknames is not valid evidence, it is clear that evidence was simply unavailing because it was unconnected to the person who made the relevant employment decision); *Rouse v. II-VI Inc.*, No. 2:06-CV-566, 2008 WL 2914796, at *18 (W.D. Pa. July 24, 2008) ("A plaintiff's testimony, however, must do more than simply express the subjective conclusion that discrimination has occurred."), *aff'd*, No. 08-3922, 2009 WL 1337144 (3d Cir. May 14, 2009); *Williams-McCoy v. Starz Encore Grp.*, No. CIV.A. 02-5125, 2004 WL 356198, at *7 (E.D. Pa. Feb. 5, 2004) ("[A] plaintiff's own assertion of racial animus does not give rise to an inference of unlawful discrimination. Where a plaintiff relies upon his own beliefs and testimony as to his own beliefs from his deposition[—]and fails to present any factual evidence linking his termination to his membership in a protected class[—]he has failed to make out a prima facie case of discrimination."); *Bullock v. Children's Hosp. of Phila.*, 71 F. Supp. 2d 482, 490 (E.D. Pa. 1999) ("Bullock testified that she believed that Tietjen discriminated

against her because of her race because she could not figure out any other reason that he would have criticized her job performance. . . . To make out a prima facie case of discrimination requires more than such speculation."). If any objective facts to which Plaintiff testified are indicative of discriminatory intent, they may serve to support his discrimination claims (their sufficiency is a separate question to which we shortly turn); however, his testimony that he thinks someone is racist or that in his opinion someone did something for discriminatory reasons cannot support his claims.[3]

   Defendant also argues that Plaintiff cannot bring a § 1981 claim in the first place because that section covers only discrimination on the basis of race, not national origin. *See Petrone v. City of Reading*, 541 F. Supp. 735, 738 (E.D. Pa. 1982). But Defendant's own chosen citation, while it declines to extend § 1981 to Italian heritage, explicitly recognizes that courts have treated Hispanic as a race for purposes of § 1981 because Hispanic people are often perceived as non-white. *Id.* "[T]he statute's reach is wider than the contemporary concept of 'race' suggests. Based upon this premise, the Supreme Court has recognized that the statute prohibits discrimination on the basis of race, ancestry, and ethnic characteristics." *Wesley v. Palace Rehab. & Care Ctr., L.L.C.*, 3 F. Supp. 3d 221, 228 (D.N.J. 2014) (citations and quotation marks omitted).[4] Many cases involve § 1981 race discrimination claims by Hispanic plaintiffs without remark on that issue. *See, e.g., Anjelino v. New York Times Co.*, 200 F.3d 73, 98 (3d Cir. 1999); *Castillo v. Am. Bd. of Surgery*, 221 F. Supp. 2d 564, 566 (E.D. Pa. 2002) ("Plaintiff's

---

[3] An exception noted below is that a plaintiff may not be able to rely only on his own unsupported statements to establish that comparators are similarly situated, *see Warfield v. SEPTA*, 460 F. App'x 127, 130 (3d Cir. 2012), but in this case the exception is irrelevant because Plaintiff has not provided any useful information about the alleged comparators' circumstances even in his own testimony.

[4] The quotation marks have been dropped because *Wesley* actually quotes *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987), somewhat incorrectly, but the point remains correct.

national origin is Peruvian and his race is Hispanic."). Defendant is incorrect, and Plaintiff may maintain a § 1981 claim along with his Title VII claims regarding national origin, as he is both Hispanic and from the Dominican Republic.

All of Plaintiff's claims are thus at least initially viable, and he may rely on facts asserted in his testimony as evidence for his claims. What must that evidence establish?

> To establish a prima facie case for discrimination under Title VII, 42 U.S.C. § 1981, and the PHRA, a plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for the position she sought to attain or retain, (3) she suffered an adverse employment action, and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.

*Paradoa v. Philadelphia Hous. Auth.*, 610 F. App'x 163, 166 (3d Cir. 2015). The final element sometimes explicitly notes that an inference of discrimination can be satisfied by showing that "similarly situated persons who are not members of her protected class were treated more favorably or that the circumstances of her termination give rise to an inference of discrimination." *Warfield v. SEPTA*, 460 F. App'x 127, 129-30 (3d Cir. 2012).[5] For a hostile environment claim, a plaintiff must show intentional discrimination that was pervasive and regular, that the discrimination detrimentally affected the plaintiff and would do likewise for a reasonable person, and the existence of respondeat superior

---

[5] Obviously the *McDonnell Douglas* burden-shifting framework would apply, under which Plaintiff must make a *prima facie* case, Defendant can then raise a legitimate, nondiscriminatory reason for the adverse action, and Plaintiff can then attempt to demonstrate that reason is merely a pretext for discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Demonstrating pretext may require stronger evidence than making a *prima facie* case, *see Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 646 (3d Cir. 1998), and some of the case law cited below with regard to comparator analysis may refer to the pretext analysis, but Plaintiff's comparator evidence in this case is so vague and limited that the Court has little difficulty concluding it is inadequate even at the *prima facie* stage.

liability. *See Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 277 (3d Cir. 2001).

The only real question on any of the claims in this case is whether Plaintiff has put forward evidence supporting the existence of discrimination, the fourth element of the primary test and the entire basis for a hostile environment claim. As explained above, Plaintiff's own supposition that Campbell or other representatives of Defendant acted on discriminatory motives cannot ground his claim. With that removed, the only approach Plaintiff takes to show discrimination under any of his claims is to point out ways in which he believes white employees were more favorably treated.

To show discrimination by way of comparators, "comparator employees must be similarly situated in all relevant respects," the determination of which "takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 1645 (U.S. 2012). "In determining whether employees are similarly situated, the court is required to undertake 'a fact-intensive inquiry based on a whole constellation of factors.'" *Mitchell v. City of Pittsburgh*, 995 F. Supp. 2d 420, 431 (W.D. Pa. 2014) (quoting *Monaco v. Am. Gen. Assurance Co.*, 359 F. 3d 296, 306 (3d Cir. 2004)). "Some of the factors to be considered are whether 'the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Id.* (quoting *McCullers v. Napolitano*, 427 Fed. Appx. 190, 195 (3d Cir. 2011) (quotation marks omitted)). In order to make these determinations, some specific information about

the comparators is necessary. *See Ferrell v. Harvard Indus., Inc.*, No. CIV. A. 00-2707, 2001 WL 1301461, at *17 (E.D. Pa. Oct. 23, 2001) (noting the plaintiff's showing was insufficient in part because he only "vaguely alleges that others were insubordinate or out of their work areas without similar consequences but names no specific individuals he believes were similarly-situated but disparately treated"); *Anderson v. Consol. Rail Corp.*, No. CIV.A. 98-6043, 2000 WL 1201534, at *8 (E.D. Pa. Aug. 9, 2000) (granting summary judgment against several different plaintiffs because they failed to cite enough evidence regarding comparators' duties or qualifications); *see also Red v. Potter*, 211 F. App'x 82, 84 (3d Cir. 2006) (tying the Rule 56(e) requirement of specific facts rather than mere allegations to a plaintiff's burden to show similarity of comparators).

It is the plaintiff's burden to put forth evidence that potential comparators are indeed similarly situated, and the plaintiff's own unsupported statements regarding the comparators' circumstances will not suffice. *See Warfield*, 460 F. App'x at 130. "Whether comparators are similarly situated is generally a question of fact for the jury. Nonetheless, summary judgment is appropriate where there is no evidence from which a jury could conclude the parties were similarly situated." *Abdul-Latif v. Cty. of Lancaster*, 990 F. Supp. 2d 517, 526 (E.D. Pa. 2014) (citations omitted).

The record is woefully devoid of facts that would support the necessary elements of Plaintiff's claims. To reiterate from above, Plaintiff notes three situations in which he claims white employees were treated favorably: disproportionate assignment to heavy zones, not being allowed to drive power equipment to the conveyor belt and park it there, and being instructed to pick up an additional job on his last day after he had started cleaning up and other employees (presumably both white and non-white) were leaving.

The only comparators Plaintiff purports to identify with respect to any of these situation are unidentified "white guys." Only in the case of the power equipment parking does Plaintiff even note that there were two particular white guys who used to work in that area and do the same conduct for which he got reprimanded. For the other situations, Plaintiff speaks entirely in general, without any kind of particularity or even numbers of employees, and certainly no names. It is worth expressly noting that this matter is now at the summary judgment stage, and Plaintiff has had ample opportunity to conduct discovery and make a record. There is absolutely no information on the record from which a jury could determine if these other employees were similarly situated in *any* respect, let alone all relevant respects. There is some very tenuous reason to believe Campbell and Plaud were in the same positions of superiority over these unidentified employees as over Plaintiff. But assumptions are required even to conclude that these other white employees held the same position as Plaintiff. We need to know who these employees were, along with their positions and other information, in order to determine if there are any "differentiating or mitigating circumstances," which might include, for instance, their seniority and history with the company. Their physical requirements would also seem relevant to questions of heavy zone assignments and the convenience of riding power equipment to their work area. It is not the Court's place to speculate on reasons that might undermine other employees' comparability, but it is Plaintiff's burden to identify them so that any determination whatsoever can be made as to their similarity. He has failed to carry that burden.

The only other potential instance of discrimination Plaintiff raised, being denied indirect time on one occasion, hardly merits mention. On that issue, there was no

reference at all to any comparators. The record does not even contain sufficient information concerning the incident with respect to Plaintiff himself, such as why he and Campbell differed over his entitlement to indirect time. It is confusing to say the least. There is clearly nothing about that incident from which a fact finder could infer it was discriminatory.

This leaves no legally cognizable evidence to ground an inference of discrimination. Plaintiff thus cannot support a *prima facie* case on any of his claims, and the court will grant summary judgment in favor of Defendant.